IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| SAMUEL L. SNEED, | : |
| Plaintiff, | : |
| v. | : CASE NO.: 1:23-CV-117 (LAG) |
| THE CITY OF ALBANY, a Municipal Corporation, | : |
| Defendant. | : |

# ORDER

Before the Court is Defendant City of Albany's Motion for Summary Judgment (Doc. 21). For the reasons below, Defendant's Motion is **GRANTED**.

## FACTUAL BACKGROUND

Plaintiff Samuel Sneed brings this suit alleging that Defendant City of Albany failed to hire him as the Airport Superintendent for the Southwest Georgia Regional Airport because of his age.[1] (*See* Doc. 1). Defendant owns and operates the Southwest Georgia Regional Airport (the Airport). (Doc. 21-2 ¶ 3; Doc. 21-3 ¶ 5; Doc. 27-2 ¶ 3). The Airport is a non-hub commercial service airport with around 40,000 flight-related operations, including three commercial Delta Airlines flights every day. (Doc. 21-2 ¶ 4; Doc. 21-3 ¶ 6; Doc. 27-2 ¶ 4). Because commercial flights are operated out of the Airport, it is subject to the Federal Aviation Administration (FAA) regulation Part 139 and the Transportation Security Administration (TSA) regulation Part 1542. (Doc. 21-2 ¶ 7; Doc. 21-3 ¶ 9; Doc. 27-2 ¶ 7); 49 C.F.R. § 1542.1; 14 C.F.R. § 139.

---

[1] The relevant facts are derived from the Parties' Statements of Material facts, responses thereto, and the record in this case. (*See* Docs. 21-2, 27-1, 27-2). When evaluating the Motion for Summary Judgment, the Court "view[s] the facts in the light most favorable to the nonmoving party on each motion." *See* Fed. R. Civ. P. 56; *Jacoby v. Baldwin County*, 835 F.3d 1338, 1342 (11th Cir. 2016) (citation omitted).

In order to operate commercial flights, the Airport must maintain its airport operating certificate by demonstrating its compliance with Part 139 to the FAA. (Doc. 21-2 ¶ 9; Doc. 27-2 ¶ 9). The FAA conducts regular inspections of the Airport to ensure compliance; and, if the FAA finds that it has failed to comply with Part 139, the FAA is authorized to pull the Airport's operating certificate, immediately halting all commercial flights in and out of the Airport. (Doc. 21-2 ¶¶ 10–12; Doc. 27-2 ¶¶ 10–12). Furthermore, noncompliance with Part 139 could negatively impact the Airport's funding through federal grants. (Doc. 21-2 ¶ 13; Doc. 27-2 ¶ 13). The Airport must also comply with TSA regulation Part 1542, which requires that the Airport maintain an airport security program approved by the TSA. (Doc. 21-2 ¶ 14; Doc. 27-2 ¶ 14).

The Transportation Department manages the Airport and the Transit Department—the department that oversees Defendant's bus system. (Doc. 21-2 ¶¶ 15–16; Doc. 27-2 ¶¶ 15–16). Transportation Director David Hamilton runs the Transportation Department, and Hamilton reported to the then City Manager Sharon Subadan. (Doc. 21-2 ¶¶ 2, 15, 19; Doc. 21-3 ¶ 3; Doc. 27-2 ¶¶ 2, 15, 19). The Airport and the Transit Department are each led by a superintendent. (Doc. 21-2 ¶ 17; Doc. 27-2 ¶ 17). The Airport Superintendent is tasked with ensuring that the Airport complies with FAA and TSA regulations. (Doc. 21-2 ¶ 20; Doc. 27-2 ¶ 20).

In late 2019, the Airport Superintendent announced his resignation. (Doc. 21-2 ¶ 34; Doc. 27-2 ¶ 34). Defendant began the search for a new Airport Superintendent and advertised the opening for the position. (Doc. 21-2 ¶ 35; Doc. 27-2 ¶ 35). The Qualifications section of the job description stated that Defendant was looking for candidates with the following education and experience:

> Bachelor's degree in Business Management or closely related field; additionally, three (3) years progressively responsible supervisory experience in airport operations, maintenance and safety to ensure compliance with FAA Part 139, TSA 1542[,] and Airport regulations and policies; or any equivalent combination of education, training, and experience which provides the requisite knowledge, skills, and abilities for this job.

2

(Doc. 21-6, Ex. 10, at 76). Hamilton and his staff reviewed the applications, and Hamilton led the interview panels. (Doc. 21-2 ¶¶ 37, 45; Doc. 21-3 ¶ 13; Doc. 27-2 ¶¶ 37, 45). Thirty candidates applied. (Doc. 27-1 ¶ 12; Doc. 30-1 ¶ 12).

Plaintiff, who was fifty-nine at the time, applied for the open Airport Superintendent position on December 15, 2019. (Doc. 21-2 ¶ 36; Doc. 27-2 ¶ 36; Doc. 21-6 at 34:8–11). At the time of his application, he worked for the Fleet Department, which is separate from the Transportation Department, as a fleet management coordinator. (Doc. 21-2 ¶¶ 23, 27, Doc. 21-6 at 61:19–24; Doc. 27-2 ¶¶ 23, 27; *see also* Doc. 21-6, Ex. 6). In this role, Plaintiff was responsible for purchasing new motor-vehicle assets for Defendant, assigning the vehicles to individual departments, and maintaining documentation for the acquired vehicles. (Doc. 21-2 ¶ 25, Doc. 21-6 at 65:14–24, 67:6–15; Doc. 27-2 ¶ 25). Plaintiff purchased equipment for the Airport but was not involved in Airport operations. (Doc. 21-2 ¶ 25, Doc. 21-6 at 65:14–24, 67:6–15; Doc. 27-2 ¶ 25).

Plaintiff provided the following work history on the resume he submitted with his application: He served the U.S. Navy from 1993 through 1998 in the following roles: Aircraft Firefighting Crash and Rescue Crew Chief (1993–1995), Airfield Services Division Supervisor (1995–1996), Education Service Officer (1995–1996), Auxiliary Outlet Manager (1996–1997), and, finally, Assistant Training Officer in the Fire Department (1997–1998). (Doc. 27-4 at 6–7). He then served as Federal Fire Inspector for the Department of the Army from 1999 through 2002. (*Id.*). Finally, Plaintiff served as a senior pastor at three different churches between 2000 and the time that he submitted the application. (*Id.*). Plaintiff attended some college and seminary school but does not have a bachelor's degree. (Doc. 21-2 ¶ 42; Doc. 27-2 ¶ 42).[2]

Defendant conducted the first round of interviews for the position on January 30, 2020. (Doc. 21-2 ¶ 43; Doc. 27-2 ¶ 43). The interview panel included Hamilton, Deputy Director of Human Resources Towanna Howard, and Assistant to City Manager Barry

---

[2] While not listed on his resume or discussed during the application process, Plaintiff testified during his deposition that he had a year of experience working at a civilian airport in Savannah, Georgia. (Doc. 21-2 ¶ 41; Doc. 21-6 at 76:14–20; Doc. 27-2 ¶ 41).

Brooks. (Doc. 21-2 ¶ 45; Doc. 27-2 ¶ 45). The panel interviewed three candidates, including Plaintiff. (Doc. 21-2 ¶ 44; Doc. 27-2 ¶ 44). After interviewing the three candidates, the panel unanimously decided that Plaintiff was the best qualified of the interviewed candidates. (Doc. 27-1 ¶ 50; Doc. 30-1 ¶ 50; Doc. 21-5 at 80:8–81:8). Hamilton then met with Subadan to discuss the candidates. (Doc. 21-2 ¶¶ 46–47; Doc. 27-2 ¶¶ 46–47). Hamilton testified that he told Subadan that Plaintiff "was probably. . . the better of the three [candidates] . . . [that the panel] interviewed." (Doc. 21-5 at 70:16–21). Hamilton and Subadan discussed the fact that Plaintiff did not have experience with the requisite FAA and TSA regulations or working at civilian airports. (*Id.* at 72:19–74:7; Doc. 21-8 at 55:12–18; 73:2–15). During his interview with the panel, Plaintiff explained that he had experience with similar government regulations and inspections relating to aircrafts through his career in the military. (Doc. 21-5 at 72:22–73:15). According to Hamilton and Subadan, Hamilton did not recommend that Defendant hire Plaintiff for the position. (*Id.* at 71:11–20; Doc. 21-8 at 37:15–38:3). Instead, Hamilton and Subadan decided to readvertise the position. (Doc. 21-5 at 71:11–18; Doc. 21-8 at 37:11–38:3).

After Defendant readvertised the position, Plaintiff applied again on June 15, 2020. (Doc. 21-2 ¶ 57; Doc. 27-2 ¶ 57). On July 8, 2020, the same interview panel interviewed Plaintiff and two other candidates. (Doc. 21-2 ¶ 58; Doc. 27-2 ¶ 58). Hamilton testified that he interviewed Plaintiff again because he knew him, and he knew that Plaintiff "really wanted the position, and so [Hamilton] wanted to give [Plaintiff] a second shot at an interview." (Doc. 21-5 at 85:3–9). After the second round of interviews, the panel unanimously ranked Plaintiff the number one candidate. (Doc. 21-2 ¶ 60, Doc. 27-2 ¶ 60). Hamilton and Subadan discussed the second round of interviews, and, according to Hamilton, had a similar conversation to the one after the first round of interviews. (Doc. 21-5 at 83:1–4). Mr. Hamilton testified that he did not recommend that Subadan hire Plaintiff. (Doc. 21-5 at 81:17–23; 83:5–8). Again, Hamilton and Subadan decided to readvertise the position. (*Id.* at 135:22–136:4; *see also* Doc. 21-6 at 100:5–12). Plaintiff testified that Hamilton told him that Subadan "wouldn't let me—she wouldn't allow me to hire you." (Doc. 21-6 at 98:24–25).

4

After the second round of interviews, Plaintiff submitted an Open Records Act request to Defendant for documents related to his interview and requested to address the City Commission regarding the decision not to hire him for the position. (Doc. 21-2 ¶ 67; Doc. 27-2 ¶ 67). After Plaintiff's request to speak to the City Commission was denied, Plaintiff met with Assistant City Manager Stepehen Collier and Hamilton in Collier's office. (Doc. 21-2 ¶¶ 69–70; Doc. 27-2 ¶¶ 69–70). Plaintiff testified that Collier explained that the City Commissioners would not get involved in the hiring decision for the Airport Superintendent, but Plaintiff could meet with Subadan over Zoom to discuss the hiring process. (Doc. 21-2 ¶¶ 70–73; Doc. 27-2 ¶¶ 70–73). Plaintiff testified that during this meeting, he asked Subadan about his qualifications for the position and Subadan told him "that it was because of [Plaintiff's] qualifications that she granted [him] an interview." (Doc. 21-6 at 109:23–110:3). Plaintiff testified that Subadan asked him "how long ago" his military experience was, and told him that he was "[h]ard-headed" and "may have to accept it may not be God's will for [him] to have the job." (*Id.* at 110:14–18, 111:11–14). Plaintiff further testified that Subadan told him that "she was looking for somebody who was more modern, somebody who was fresher, and somebody who represented the future of the airport and not the past." (*Id.* at 111:2–6). Finally, Plaintiff testified that Subadan told him that "if [he] could let [the Airport Superintendent position] go, she could consider [him] for another position that [he would be] better qualified for." (*Id* at 112:6–8).

Barry Brooks, who served as Assistant to the City Manager during the relevant time period and was a member of the interview panel, testified that—while he is not sure how—at some point, he got the impression that Subadan "was looking for someone younger, fresher, modern for the Superintendent position." (Doc. 27-7 at 64:3–6; Doc. 21-2 ¶ 45; Doc. 27-2 ¶ 45). The following exchange occurred during Brooks' deposition:

> Q     But within, those are the names you recall expressing that Ms. Subadan made that comment?
>
> A     No. Somewhere there was a -- I cannot recall who specifically I heard that kind of a comment from. All I can say is that I do recall there was a -- somehow I picked up that information.

> Q     Okay. But someone within the City Manager's Office employee-wise is where you heard that from?
>
> A     Or somebody who may have been visiting the City Manager's Office.
>
> Q     But you can't recall who that may have been?
>
> A     No.
>
> Q     Okay. But the undercurrent was that she was looking for someone younger, fresher, modern for the Superintendent position?
>
> A     Yes.

(Doc. 27-7at 63:16–64:6). Plaintiff applied for the Airport Superintendent position after the third posting. (Doc. 21-2 ¶ 83; Doc. 27-2 ¶ 83). Defendant conducted a third round of interviews for the Airport Superintendent position in September 2020. (Doc. 21-2 ¶ 82; Doc. 27-2 ¶ 82). Hamilton decided not to interview Plaintiff. (Doc. 21-2 ¶ 84; Doc. 27-2 ¶ 84).

A panel consisting of the same interviewers interviewed six new candidates, including Shaun Cookson, who Defendant eventually hired. (Doc. 21-2 ¶¶ 85–86; Doc. 27-2 ¶ 85–86). Cookson was thirty-two years old at the time he applied for the job. (Doc. 21-4 at 58:10–13). Cookson had three years of experience working for the City of Quincy, Illinois as an airport operations and maintenance technician, two years of experience working at the Gulfport-Biloxi Regional Airport Authority as an airport operations supervisor, and, most recently, one and half years of experience working as the deputy airport director at San Angelo Regional Airport. (Doc. 21-4, Ex. 1). Cookson was second in command at the San Angelo Regional Airport and testified that he supervised six individuals within the operations and maintenance department, and oversaw the day-to-day activities of the airport. (Doc. 21-4 at 34:8–35:23). He also testified that he ensured that the San Angelo Regional Airport was in compliance with FAA and TSA regulations. (*Id.*). His resume also shows that he was designated as an Airport Certified Employee by the

6

American Association of Airport Executives and an International Aerodrome Certified Employee. (*Id.*, Ex. 1). These certification processes test applicants on FAA and TSA compliance. (*Id.* at 12:8–13:21). Plaintiff does not have either of these certifications. (Doc. 21-6 at 52:22–53:3). After the third round of interviews, Subadan and Hamilton met for a final time. (Doc. 21-2 ¶¶ 115–16; Doc. 27-2 ¶¶ 115–16). Hamilton recommended Cookson for the Airport Superintendent role. (Doc. 21-2 ¶¶ 115–16; Doc. 27-2 ¶¶ 115–16). Defendant hired Cookson as the Airport Superintendent. (Doc. 21-2 ¶ 118; Doc. 27-2 ¶ 118).

## PROCEDURAL BACKGROUND

Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) on October 7, 2020, and the EEOC issued a Notice of Right to Sue Letter on May 1, 2023. (Docs. 1-1, 1-2). Plaintiff filed this employment discrimination action against Defendant on July 28, 2023. (Doc. 1). Therein, Plaintiff asserted a claim for age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.*, alleging that Defendant did not hire him for the Airport Superintendent role because of his age. (Doc. 1 ¶¶ 40–48). Defendant filed the Motion for Summary Judgment on August 29, 2024. (Doc. 21). Plaintiff responded, after receiving an extension, on November 5, 2024, and Defendant replied on November 18, 2024. (Docs. 22–27, 30). The Motion for Summary Judgment is ripe for review. M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, summary judgment is appropriate where "the evidence shows 'that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Gogel v. Kia Motors Mfg. of Georgia, Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (en banc) (quoting Fed. R. Civ. P. 56(a)). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (citation omitted). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646

7

(11th Cir. 1997) (citations omitted). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1311 (11th Cir. 2018) (quoting *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004)). At summary judgment, the Court views the evidence "in the light most favorable to the non-moving party" and resolves factual disputes for the non-moving party when doing so is supported by sufficient evidence. *Gogel*, 967 F.3d at 1134 (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1363 (11th Cir. 2007)); *Whitehead v. BBVA Compass Bank*, 979 F.3d 1327, 1328 (11th Cir. 2020).

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018); *Whitehead*, 979 F.3d at 1328. The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986); *McGee v. Sentinel Offender Servs.*, 719 F.3d 1236, 1242 (11th Cir. 2013) (per curiam). If the movant meets their initial burden, the non-moving party must demonstrate that there is a genuine dispute for trial. *Whitehead*, 979 F.3d at 1328 (citing *Celotex Corp.*, 447 U.S. at 324). "The nonmovant is required to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 557 (11th Cir. 2014) (per curiam) (citing *Celotex*, 477 U.S. at 324).

## DISCUSSION

Defendant moves for summary judgment on Plaintiff's age discrimination claim. (Doc. 21). It argues that Plaintiff's alleged direct evidence of discrimination is actually circumstantial evidence of discrimination, requiring the Court to apply the *McDonnell Douglas* standard, and that summary judgment is appropriate because it had a legitimate,

non-discriminatory reason not to hire Plaintiff and to hire Cookson, who, while younger than Plaintiff, was more qualified to run a civilian airport. (Doc. 21-1 at 12–20).

"The ADEA, whose purpose is 'to promote employment of older persons based on their ability rather than age,' prohibits certain actions by an employer, including the termination of, or deprivation of employment opportunities against, an employee who is at least 40 years old because of that employee's age." *Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1270 (11th Cir. 2014) (citation omitted) (first quoting 29 U.S.C. § 621(b); and then citing §§ 623(a)(1)–(2), 631(a)). A plaintiff may support an ADEA claim through either direct or circumstantial evidence. *Id*. "To ultimately prevail, [a] plaintiff must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision." *Id*. (alteration in original) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 173–180 (2009)). Unlike Title VII, the text of the ADEA does not authorize a mixed-motive age discrimination claim. *See Gross*, 557 U.S. at 173–180. "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id*. at 180. Thus, "[t]he ADEA requires that age [be] the reason that the employer decided to act." *Mora v. Jackson Mem. Found., Inc.*, 597 F.3d 1201, 1204 (11th Cir. 2010) (per curiam) (citations and quotations omitted). "This showing can be made through either direct or circumstantial evidence." *Liebman v. Metro. Life Ins.*, 808 F.3d 1294, 1298 (11th Cir. 2015) (per curiam) (citing *Mora*, 597 F.3d at 1204).

Direct evidence of discrimination is evidence that "reflects 'a discriminatory . . . attitude correlating to the discrimination . . . complained of by the employee.'" *Van Voorhis v. Hillsborough Cnty. Bd. of Cnty. Comm'rs*, 512 F.3d 1296, 1300 (11th Cir. 2008) (per curiam) (citation omitted). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.*, 120 F.3d 1181, 1189 (11th Cir. 1997) (citations and punctuation omitted). "Reliance on factors correlated with age does not *by itself* constitute age discrimination." *Dilla v. West*, 179 F.3d 1348, 1349 (11th Cir. 1999) (per curiam) (emphasis added).

9

Further, "[e]ven where direct evidence of discrimination exists, [a plaintiff] must present evidence of an adverse employment action." *Van Voorhis*, 512 F.3d at 1300 (citation omitted). The Parties do not dispute that Plaintiff suffered an adverse employment action—he was not hired for the Airport Superintendent position. (*See* Doc. 21-1 at 11, 13 n.16, Doc. 27 at 11).

Plaintiff argues that the Brooks' deposition testimony that someone in the City Manager's office said that Subadan "was looking for someone, younger, fresher, modern for the Superintendent position" constitutes direct evidence of age discrimination. (Doc. 27 at 7–10). Plaintiff argues that this statement is admissible because it is not hearsay. (*Id.*). Plaintiff contends that the statement is an admission by an opposing party because both Brooks and the declarant referred to in Brooks' statement were City employees. (*Id.*). Defendant argues that this statement is "double hearsay" that cannot be reduced to an admissible form. (Doc. 30 at 2–6). Plaintiff does not present any other direct evidence to support his discrimination claim. (*See* Doc. 27).

"[A] district court may consider a hearsay statement in passing on a motion for summary judgment if the statement c[an] be 'reduced to admissible evidence at trial' or 'reduced to admissible form.'" *Macuba v. Deboer*, 193 F.3d 1316, 1323 (11th Cir. 1999) (quoting *Wright v. Southland Corp.*, 187 F.3d 1287 (11th Cir. 1999) and collecting cases). While it is not (1) clear that there was any actual statement, as Brooks stated that "somehow [he] picked up that information[,]" or (2) who—if anyone—made such a statement, it is clear that any such statement could not be reduced to admissible evidence at trial. (*See* Doc. 27-7 at 63:16–64:6). Plaintiff does not argue that Subadan made the comment to Brooks. (Doc. 27 at 7–10). Moreover, Brooks has no idea who—if anyone—made any such statement; and discovery is now closed. (*See* Doc. 27-7 at 63:16–64:6). Plaintiff has set forth no evidence that he has identified the unknown speaker or otherwise obtained some means of reducing the statement to admissible form. (*See* Doc. 27 at 7–10). Thus, the Court will not consider this statement for purposes of the Motion for Summary Judgment, and Plaintiff has set forth no direct evidence of discrimination. When an ADEA claim is based on circumstantial evidence, courts apply the framework established in *McDonnell Douglas*

10

*Corp. v. Green*, 411 U.S. 792 (1973). *See Sims v. MVM, Inc.*, 704 F.3d 1327, 1332 (11th Cir. 2013). Under *McDonnell Douglas*, to make a prima facie case of age discrimination, Plaintiff must show: "(1) he was a member of the protected group between the age of forty and seventy; (2) he was subject to an adverse employment action; (3) a substantially younger person filled the position for which he [applied]; and (4) he was qualified to do the job [for which he applied]." *Liebman*, 808 F.3d at 1298.

Defendant does not argue that Plaintiff has not established a prima facie case, but instead argues that Defendant had a legitimate, nondiscriminatory reason for not hiring Plaintiff. (*See* Doc. 21-1 at 13–14). Once a plaintiff establishes a prima facie case, the burden shifts to the employer to "rebut the presumption of discrimination with evidence of a legitimate, nondiscriminatory reason for the adverse employment action." *Liebman*, 808 F.3d at 1298 (citation omitted). "[T]he employer's burden is merely one of production; it 'need not persuade the court that it was actually motivated by the proffered reasons.'" *Chapman*, 229 F.3d at 1024 (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997)). "If the employer proffers a legitimate, nondiscriminatory reason, the burden shifts back to the employee to show that the employer's reason is a pretext." *Liebman*, 808 F.3d at 1298 (citation omitted); *see also Combs*, 106 F.3d at 1538.

Defendant's proffered non-discriminatory reason for re-advertising the position after interviewing Plaintiff twice is that Plaintiff did not have experience with the FAA and TSA regulations needed "to ensure that its . . . Airport maintains 'compliance with FAA Part 139, TSA 1542, and [a]irport regulations and policies,'" which is "essential for the . . . Airport's continued commercial operations." (Doc. 21-1 at 13–14 (quoting Doc. 21-6, Ex. 10, at 69–78; and then citing Doc. 21-6 at 73:16–74:2; and then citing Doc. 21-4 at 26:7–18, 28:22–24)). Moreover, Defendant offers the rationale that the additional facts that Plaintiff did not have experience working at a civilian airport and had been working as a pastor for the prior 20 years made him unqualified for the position. (*Id.* at 14).

The Eleventh Circuit has made clear that a defendant can make an employment decision "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for discriminatory reasons." *Akridge v. Alfa Ins.*,

11

943 F.4th 1181, 1195 (11th Cir. 2024) (quoting *Owens v. Governor's Off. of Student Achievement*, 52 F.4th 1327, 1338 (11th Cir 2022)). When considering an employer's proffered reasons for termination, the Court does not "sit as a super-personnel department that reexamines an entity's business decisions," and may not "analyze whether an employer's proffered reasons are prudent or fair." *Id.* (quoting *Owens*, 52 F.4th at 1338). Defendant's reasoning for not hiring Plaintiff—that it wanted to hire someone who had experience working in civilian airports and who was familiar with the regulations that impact civilian airports—was not discriminatory and, thus, Defendant has met its burden of production. *See Chapman*, 229 F.3d at 1024.

The burden, thus, shifts to Plaintiff to show that the proffered reason was pretextual. *Liebman*, 808 F.3d at 1298. "A reason cannot be proved to be a pretext *for discrimination* unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Akridge*, 943 F.4th at 1196 (quoting *Ring v. Boca Ciega Yacht Club Inc.*, 4 F.4th 1149, 1163 (11th Cir. 2021)). Furthermore, "[t]he pretext inquiry centers on the employer's belief, not the employee's beliefs and to be blunt about it, not on reality as it exists outside the decision maker's head." *Id.* (quoting *Todd v. Fayette Cnty. Sch. Dist.*, 998 F.3d 1203, 1214 (11th Cir 2021)). Accordingly, Plaintiff must demonstrate "such weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's proffered reasons "that a reasonable factfinder could find them unworthy of credence." *Flournoy v. CML-GA WB, LLC*, 851 F.3d 1335, 1339–40 (11th Cir. 2017) (quoting *Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 771 (11th Cir. 2005) (per curiam)).

Plaintiff argues that Defendant's proffered reason is pretextual because Hamilton screened out nine candidates with college and master's degrees in aviation and significant experience working in civilian airports resulting in knowledge of FAA and TSA regulations. (Doc. 27 at 14). While there is evidence on the record that several candidates with civil aviation experience and/or aviation degrees were not interviewed during the first two rounds of interviews, there is no evidence that those candidates were otherwise qualified or available to be interviewed. (Doc. 27-4 at 22–128; Doc. 27-5 at 1–108). When asked why candidates may be screened out of an interview, Hamilton testified that "[t]here

12

were several reasons. The applicant could not be qualified. The applicant could not be contacted. The applicant could have declined an interview, or the applicant has simply taken a position somewhere else." (Doc. 21-5 at 133:20–134:10). Furthermore, Hamilton also screened out qualified candidates "if their salary demand [was] too high[.]" (*Id.* at 134:11–15). Moreover, that Subadan asked Plaintiff, "how long ago" his military experience was and told him that "she was looking for somebody who was more modern, somebody who was fresher, and somebody who represented the future of the airport and not the past" does not indicate pretext. (Doc. 21-6 at 109:23–111:6). Hamilton and Subadan expressed concern that Plaintiff lacked the experience with key regulations. (Doc. 21-5 at 72:19–74:7; Doc. 21-8 at 55:12–18, 73:2–15). Plaintiff's relevant experience with federal regulations similar to the FAA was earned in the military. (Doc. 21-5 at 72:19–74:7; Doc. 21-8 at 55:12–18, 73:2–15). Asking how recent Plaintiff's military service was not necessarily improper. (*See* Doc. 21-6 at 109:23–110:5). During his first interview with the panel, Plaintiff, who did not have the requisite experience with FAA and TSA regulations, explained that he had experience with similar aviation related government regulations when he was serving in the military between 1993 and 2002. (Doc. 21-5 at 72:22–73:15). Considered, in context, Subadan's question about the recency of Plaintiff's military service is not evidence of pretext. (*See* Doc. 21-6 at 109:23–110:6). Moreover, Plaintiff agreed that "the terms fresh and modern in this context [could] also be interpreted as a desire to ensure that the person who's hired had more recent experience managing an airport[.]" (*Id.* at 115:7-14). While Plaintiff testified that Subadan's statement could have been interpreted differently than how he perceived it but for "the intensity [of] the conversation[,]" Plaintiff's interpretation of the conversation is not relevant to the pretext inquiry. (*Id.* at 115:24); *see Akridge*, 943 F.4th at 1196. Regardless of Plaintiff's interpretation of Subadan's question and statement, Plaintiff has failed to demonstrate "such weaknesses, implausibilities, inconsistencies, or contradictions" in Defendant's proffered reasons "that a reasonable factfinder could find them unworthy of credence." *Flournoy*, 851 F.3d at 1339.

Even if age was a motivating factor in Defendant's decision not to hire Plaintiff, the ADEA does not authorize a finding of discrimination based on evidence that an employer had a mixed motive when taking an adverse employment action. *See Gross*, 557 U.S. at 173–80. Rather "[t]he ADEA requires that age [be] the reason that the employer decided to act." *Mora*, 597 F.3d 1201, 2014 (11th Cir. 2010) (second alteration in original) (citations and quotations omitted). Accordingly, Defendant is entitled to summary judgment on Plaintiff's age discrimination claim.

## CONCLUSION

Accordingly, Defendant's Motion for Summary Judgment (Doc. 21) is **GRANTED**.

**SO ORDERED**, this 31st day of March, 2025.

/s/ Leslie A. Gardner
**LESLIE A. GARDNER, CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**